IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ANTONIO CRAWFORD, | ) | No. 34755-9-III |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SPOKANE REGIONAL SAFE STREETS | ) | UNPUBLISHED OPINION |
| TASK FORCE, | ) | |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, J. — Antonio Crawford appeals the superior court's refusal to reverse

a hearing examiner's decision ordering forfeiture under the Uniform Controlled

Substances Act, chapter 69.50 RCW, of over $80,000 in United States currency from Mr.

No. 34755-9-III
*Crawford v. Spokane Reg'l Safe Streets Task Force*

Crawford's bank accounts and safe deposit boxes. The Spokane Regional Safe Streets Task Force, which seized the currency, presented evidence that Mr. Crawford was involved in extensive drug trafficking before the money was seized. Its forensic accounting demonstrated that little of the seized money could be explained by the legitimate sources of income and assets Mr. Crawford disclosed in discovery. Because this is substantial circumstantial evidence supporting the hearing examiner's findings, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

After four days of hearings, Spokane County Hearing Examiner Michael C. Dempsey, ordered forfeiture to the Spokane Regional Safe Streets Task Force of United States currency seized in seven installments from the person, bank accounts, or safe deposit boxes of Antonio Crawford.[1] Administrative Record (AR) at 59. The hearing examiner made extensive factual findings in his 42-page, single spaced findings, conclusions and order. Rather than obtain a transcript of the proceedings, Mr. Crawford represents in his opening brief that the parties stipulated that the hearing examiner's recitation of the testimony was substantially accurate and they agreed to rely on his findings of fact as a complete and accurate summary of the evidence. Br. of Appellant

---

[1] It was the Spokane Regional Drug Task Force that actually seized Mr. Crawford's property; it was consolidated into the Spokane Regional Safe Streets Task Force during the course of the proceedings.

2

at 6. Those findings are the basis of the following history of the Task Force investigation, the seizures, and the forfeiture proceeding.

In May 2014, Lewis Pardun was arrested for shoplifting and possessing controlled substances. In exchange for law enforcement's promise to not pursue the charges against Mr. Pardun, he agreed to become a confidential informant for the Task Force. Mr. Pardun informed Task Force members that he could purchase controlled substances from Mitch Lawler, whose source of supply for oxycodone was Mr. Crawford.

In June 2014, Task Force members asked Mr. Pardun to set up a controlled buy from Mr. Lawler. The buy was arranged to take place at a Walmart store in Spokane Valley. At around 2:35 p.m., while under surveillance, Mr. Pardun drove to the store with $870 of prerecorded buy money to purchase 30 oxycodone pills from Mr. Lawler. A 2011 Chevrolet Impala owned by Mr. Crawford pulled into the parking lot and Mr. Lawler got out on the front passenger side wearing a backpack. Mr. Lawler walked to Mr. Pardun's car, got in on the passenger side, got out a few minutes later, and walked into the Walmart store. Mr. Crawford then left his Impala and walked into the Walmart store. Surveillance video showed the two men enter the men's restroom. Both then left the Walmart store separately, and Mr. Crawford drove off in his Impala, alone. The pills Mr. Pardun purchased from Mr. Lawler were turned over to the Task Force and confirmed to be oxycodone.

3

Following the controlled buy, Task Force members interviewed Mr. Lawler, who admitted to being addicted to heroin and to illegally selling drugs to support his habit. He said his exclusive supplier of oxycodone was Mr. Crawford. Investigation by the Task Force of Mr. Crawford's criminal history revealed prior felony convictions, including a conviction for the sale of cocaine; a conviction for the manufacture, delivery, or possession with intent to sell controlled substances; and a California conviction for transporting or selling narcotics or controlled substances.

In August 2014, the Task Force began surveillance of Mr. Crawford's activities. One incident at a Zip Trip store involved Mr. Crawford in his Impala along with two other vehicles and their occupants entering and exiting vehicles and making hand exchanges, consistent with the illegal sale of controlled substances.

Mr. Crawford was arrested on November 12, 2014, for delivery of a controlled substance based on his participation in Mr. Pardun's controlled buy at the Walmart store in June. He had $1,000 cash in his front pants pocket at the time of his arrest. The Task Force at the same time obtained an order freezing Mr. Crawford's 15 local bank and credit union accounts. Also in November 2014, the Federal Bureau of Investigation subpoenaed records for the 15 accounts held by Mr. Crawford at Spokane banking institutions.

Two months after Mr. Crawford's arrest, the Task Force seized $25,000.00 in cash from a safe deposit box rented by Mr. Crawford and $54,948.17 in currency from several

4

bank and credit union accounts controlled by Mr. Crawford. Mr. Crawford timely notified the Task Force of his claim of ownership or right to possession to all property seized in November 2014 and thereafter. The Spokane County sheriff appointed Mr. Dempsey to act as a hearing examiner in the proceeding for forfeiture of the currency.

In March 2015, the criminal case against Mr. Crawford went to trial. Mr. Lawler testified that Mr. Crawford supplied him with the oxycodone pills he sold to Mr. Pardun in June 2014, and instructed Mr. Lawler to meet him in the restroom after the deal to avoid detection because there was no camera in the restroom. Mr. Pardun also testified at Mr. Crawford's trial, consistent with what Task Force members had seen and been told by him in June. Despite this evidence, a jury acquitted Mr. Crawford.

The forfeiture proceeding moved forward, with the parties engaging in discovery. Among the subject matters inquired into by interrogatories served on Mr. Crawford and to which he responded was his employment history and all sources of income or assets. The Task Force also requested and obtained copies of his tax returns.

Shakayla Delcambre testified at Mr. Crawford's forfeiture hearing. She testified that she had known Mr. Crawford for approximately two years and between May 2013 and August 2014 had made between 20 and 30 trips to California for him. On those trips, a man would pick her up from the airport, take her to a hotel, and give her blue oxycodone pills to conceal in a condom inside her body. She testified that the amount

5

she carried would vary, but one time she carried 5,000 pills.[2] Most of the time Mr. Crawford would pick her up at the airport on her return and take her to her house where she would go inside, extract the pills from her body, and give them to Mr. Crawford. A GPS[3] tracker placed on Mr. Crawford's car confirmed that on at least one occasion his car was at the Spokane International Airport 6 minutes before Ms. Delcambre's flight arrived and then, 20 minutes later, was near Ms. Delcambre's home.

Ms. Delcambre also testified that in 2014 she served as a middlewoman in her boyfriend's purchase of a substantial amount of oxycodone (although less than 100 pills) from Mr. Crawford.

Mr. Crawford had previously been arrested in 2002 in Spokane for delivery of crack cocaine. In an interview after that arrest, Mr. Crawford admitted to a detective that he had sold crack cocaine since 1989 and had sold heroin over the preceding six months. He admitted he made an average of $2,000 per month selling the controlled substances. Also in that interview, Mr. Crawford told the detective he was purchasing a home in Spokane and some of the money used for the down payment was comingled with money he earned from selling the controlled substances.

---

[2] Testimony from Messrs. Pardun and Lawler supported a street value for 30 mg oxycodone pills in 2014 of $29-$30 a pill.

[3] Global Positioning System.

The hearing examiner found that although Mr. Crawford had obtained a business license for a sole proprietorship called "Crawford Entertainment" that he claimed provided entertainment and event and concert promotion services, he never listed any business activity on its annual return in 2013 and had paid no excise tax for the business in 2014. In response to an interrogatory, Mr. Crawford admitted Crawford Entertainment had not conducted any business or generated any income. The hearing examiner found the business to be fictitious.

Mr. Crawford's girlfriend and part-time employer in and after December 2013 at her coffee shop also testified in the forfeiture hearing. Payroll stubs indicated that Mr. Crawford earned $675.54 in 2013 and $7,219.64 in 2014 from his coffee shop employment.

Mr. Crawford stated in interrogatory answers that none of the currency seized by the Task Force was associated with the exchange of a controlled substance. He claimed he acquired the money through school loans, employment, the sale of real property, gifts or loans from family members, and tax refunds. He stated that he earned $9.32 an hour working as a research assistant between September 2012 and August 2014 and $9.47 an hour working as a custodian between September 2014 and the time of the hearing. He stated he had earned $10.00 per hour working at his girlfriend's coffee shop between December 2013 and the time of the hearing.

7

Regarding funds that Mr. Crawford claimed were proceeds from the sale of a house, the hearing examiner found that the proceeds likely came from the sale of the house he purchased in 2002. While those proceeds were from the sale of an asset other than drugs, the hearing examiner found that Mr. Crawford's admission that he purchased the house with comingled money from employment and illegal drug dealing subjected the home proceeds to forfeiture.

The hearing examiner found that Mr. Crawford changed the way he hid or disguised illegal drug proceeds after he was arrested and convicted in 2002. At the time of his 2002 arrest, the United States Drug Enforcement Administration seized $8,000 in illegal drug proceeds from his home. The hearing examiner found that after his release from prison in 2012, Mr. Crawford opened multiple bank accounts and spread the proceeds from his illegal drug trafficking business and legitimate income and receipts among them, to help disguise the illegal funds.

The hearing examiner found that between September 1, 2012 and November 12, 2014, Mr. Crawford had approximately $82,000.00 in unexplained income. He found that all of the $80,948.17 seized by the Task Force met the criteria for forfeiture under RCW 69.50.505(1)(g). He ordered the monies forfeited in an order entered on December 9, 2015, and that was corrected in minor respects a few days later. A motion for reconsideration filed by Mr. Crawford was denied.

8

Mr. Crawford petitioned the superior court for review, contending that "[t]he Findings of Fact . . . are not supported by substantial evidence and the Conclusions of Law . . . are contrary to the provisions of RCW 69.50.050." AR at 7. The court affirmed the hearing examiner. Mr. Crawford appeals.

## ANALYSIS

Judicial review of agency decisions in forfeiture proceedings is governed by the Administrative Procedure Act (APA), Title 34 RCW. RCW 69.50.505(5). We review the hearing examiner's order, not the decision of the superior court. *City of Sunnyside v. Gonzalez*, 188 Wn.2d 600, 607-08, 398 P.3d 1078 (2017). Mr. Crawford bears the burden of showing the forfeiture order was erroneous. *Id.* at 608.

The APA authorizes courts to grant relief from an agency order in an adjudicative proceeding in only nine enumerated instances. RCW 34.05.570(3). Mr. Crawford's petition for judicial review relies two: that the order is not supported by substantial evidence and that the agency has erroneously interpreted or applied the law. RCW 34.05.570(3)(d), (e).

Where the sufficiency of the evidence is challenged, we must be satisfied that the seizing law enforcement agency presented a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the hearing examiner's order. *Gonzalez*, 188 Wn.2d at 612. The claimant must carry the burden of showing otherwise. *Id.*

9

We review de novo whether an agency erroneously interpreted and applied the law. *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998). Mr. Crawford's challenge to the hearing examiner's application of the law is that he allegedly shifted the burden of proof to Mr. Crawford to prove that the seized property was obtained from legitimate sources. *See* Reply Br. at 10. We address the challenges in turn.

*Sufficiency of evidence*

"RCW 69.50.505(1)(g) has three distinct clauses, that allow forfeiture of the following":

> [(1)] [a]ll moneys, negotiable instruments, securities, or other tangible or intangible property of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this chapter . . . ,
>
> [(2)] all tangible or intangible personal property, proceeds, or assets acquired in whole or in part with proceeds traceable to an exchange or series of exchanges in violation of this chapter . . . , and
>
> [(3)] all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this chapter.

*Gonzalez*, 188 Wn.2d at 609-10 (alterations in original). As in *Gonzalez*, it is not entirely clear in this case which of the clauses is at issue. In his ultimate findings of fact,[4] the

---

[4] Mr. Crawford devotes part of his briefing to arguing that the hearing examiner erred by labeling these as findings of fact rather than as conclusions of law. Where findings are mislabeled, the error is inconsequential; we simply treat them on appeal as

hearing examiner states that the Task Force established by a preponderance of the

evidence that the currency seized met one or more of the criteria described in the three

clauses.

Mr. Crawford assigns error to these ultimate findings of fact, numbered 206

through 210.[5] They state:

> 206. The [Task Force] established by a preponderance of the evidence that
> the $25,000 seized from Antonio Crawford's safety deposit box was money
> furnished or intended to be furnished in violation of RCW Chapter 69.50;
> money intended to be used to facilitate a violation of RCW Chapter 69.50;
> and/or proceeds acquired in whole or in part with proceeds traceable to an
> exchange or series of exchanges by Crawford in violation of RCW Chapter
> 69.50, i.e. proceeds from the sale of his house that are traceable to moneys
> furnished to Crawford in exchange for a controlled substance commingled
> with money that Crawford derived from legitimate income.

---

what they are. *E.g., Willener v. Sweeting*, 107 Wn.2d 388, 394, 730 P.2d 45 (1986).

In this case, findings 206 through 210 *are* findings of fact: they state the hearing examiner's determination that evidence showed the seized currency fit one or more of the factual criteria that would make it forfeitable. *See Inland Foundry Co. v. Dep't of Labor & Indus.*, 106 Wn. App. 333, 340, 24 P.3d 424 (2001) ("'If a determination concerns whether evidence shows that something occurred or existed, it is properly labeled a finding of fact.'" (quoting *State v. Niedergang*, 43 Wn. App. 656, 658, 719 P.2d 576 (1986))). Because the findings directly address the statutory criteria for forfeiture, they are "ultimate" findings of fact, as the Supreme Court observed in *Gonzalez*. *See* 188 Wn.2d at 613.

[5] The Task Force argues that Mr. Crawford did not properly assign error to the findings under RAP 10.3(a)(4) and we should therefore treat them as verities on appeal. But we generally excuse a party's failure to assign error where the briefing makes the nature of the challenge clear. *Noble v. Lubrin*, 114 Wn. App. 812, 817, 60 P.3d 1224 (2003); *State v. Olson*, 126 Wn.2d 315, 323, 893 P.2d 629 (1995). Mr. Crawford's briefing does so here.

207. The [Task Force] established by a preponderance of evidence that Antonio Crawford, between September 1, 2012 and December 1, 2014, deposited approximately $57,000 (i.e. excluding the $25,000 seized from his safety deposit box) that was not derived from legitimate income or other funding sources into his 15 local bank/credit union accounts; and that such moneys were furnished or intended to be furnished in exchange for a controlled substance in violation of RCW Chapter 69.50, proceeds acquired in whole or in part with proceeds traceable to an exchange or series of exchanges in violation of RCW Chapter 69.50, or moneys used or intended to be used to facilitate a violation of RCW Chapter 69.50.

208. The [Task Force] established by a preponderance of evidence that Antonio Crawford used or intended to use the monies that he obtained from legitimate sources, such as employment or school loans, and deposited into his 15 local accounts, to facilitate a violation of RCW Chapter 69.50; by intentionally co-mingling such monies with the $57,000 in illegal moneys or proceeds that he deposited into his accounts, in order to disguise and "launder" such illegal monies or proceeds, and to avoid detection by law enforcement.

209. The $8,802.66, $16,120.71, $1.24, $15,365.47 and $14,658.09 in [United States] currency, totaling $54,948.17, seized from Antonio Crawford's bank accounts in January 2015 are moneys furnished or intended to be furnished by or to Crawford, or others, in exchange for a controlled substance in violation of RCW Chapter 69.50, and/or moneys used or intended to be used to facilitate a violation of RCW Chapter 69.50.

210. The [Task Force] established by a preponderance of evidence that the $1,000 in [United States] currency seized from Antonio Crawford on November 12, 2014, incident to his arrest, was money furnished or intended to be furnished in exchange for a controlled substance in violation of RCW Chapter 69.50, or a combination of legitimate money that Crawford intentionally commingled with illegal drug proceeds in order to facilitate a violation of RCW Chapter 69.50.

Clerk's Papers (CP) at 47-48.

The burden of proof is on a seizing agency to establish by a preponderance of the evidence that property is subject to forfeiture. RCW 69.50.505(5). The agency "may meet its burden through direct or circumstantial evidence." *Sam v. Okanogan County Sheriff's Office*, 136 Wn. App. 220, 229, 148 P.3d 1086 (2006). Because buyers and sellers will often avoid creating and retaining direct evidence of illegal drug dealing, proof is likely to be by circumstantial evidence. "Circumstantial evidence is evidence of facts or circumstance from which the existence or nonexistence of other facts may be reasonably inferred from common experience." *State v. Jackson*, 145 Wn. App. 814, 818, 187 P.3d 321 (2008).

Mr. Crawford stated in response to prehearing discovery that the money in his accounts came from the sale of real estate, employment, tax refunds, school loans, and gifts or loans from family. While the Task Force's forensic accountant found this to be true as to a relatively small amount in the accounts, the evidence supports the conclusion that Mr. Crawford comingled the legitimate monies with a larger amount of money forfeitable under the criteria provided by RCW 69.50.505(1)(g). A preponderance of evidence established that Mr. Crawford was an active drug dealer. The forensic accountant demonstrated that monies in the accounts were not explained by the only gainful employment and other legitimate sources he identified.

For example, the hearing examiner found that between September 10, 2012 and December 10, 2012—a three month period—Mr. Crawford deposited checks from

13

employment into his accounts. But he also deposited approximately $4,500 in cash or money orders from unexplained sources into the same accounts. During this period of time, Mr. Crawford was living in a halfway house and, according to Mr. Lawler, was dealing large quantities of oxycodone.

In 2013, Mr. Crawford deposited checks and cash in the amounts of $280.75, $1,826.87, and $730.00 from legitimate sources. However, that still left a sum of $22,441.67 in deposits into those same accounts that was unexplained. During this period of time, Mr. Lawler testified that Mr. Crawford supplied him with large quantities of oxycodone pills to deal, and Ms. Delcambre testified that she acted as Mr. Crawford's drug mule, smuggling oxycodone from California to Spokane.

In 2014, Mr. Crawford's net income should have been reported as $12,075.35 for his work as a research assistant, custodial services, and coffee shop employee. But he had $58,000.00 in unexplained income or funds in 2014. Again, according to Mr. Lawler, Mr. Crawford was supplying him with large quantities of oxycodone pills during this time frame. And according to Ms. Delcambre, she continued to make frequent trips to California to smuggle large quantities of oxycodone pills back to Spokane for Mr. Crawford.

This circumstantial evidence supports the hearing examiner's inference that the monies seized from Mr. Crawford met the criteria supporting forfeiture under RCW 69.50.505(1)(g), either as "furnished . . . by [a] person in exchange for a controlled

14

substance" in violation of chapter 69.50 RCW, or as the proceeds of the home Mr. Crawford "acquired in whole or in part with proceeds traceable to an exchange or series of exchanges in violation of this chapter," or as money "used or intended to be used to facilitate any violation of this chapter."

### *Allocating the burden of proof*

Mr. Crawford contends that by finding only that some monies seized from Mr. Crawford's accounts and safe deposit boxes came from unexplained sources, the hearing examiner impermissibly shifted the burden to Mr. Crawford to prove that the funds came from a source that did not make them forfeitable. But it is more accurate to say that the hearing examiner found that the funds did not come from any legitimate source identified by Mr. Crawford in discovery, Mr. Crawford was extensively engaged in drug trafficking during the relevant period of time, and it was reasonable to infer from this circumstantial evidence that the currency was more likely than not "furnished . . . by [a] person in exchange for a controlled substance," or the proceeds of the home Mr. Crawford "acquired in whole or in part with proceeds traceable to" drug transactions, or was money "used or intended to be used to facilitate any violation of this chapter"—all forfeitable circumstances under RCW 69.50.505(1)(g).

The Supreme Court's decision in *Gonzalez* reversed an unpublished decision of this court and is a good illustration of when a seizing agency's case falls short of its burden of proof. In that case, as the Supreme Court explained, the hearing examiner

15

determined that Mr. Gonzalez's testimony was not credible (a determination entitled to deference) and that "Gonzalez had multiple cell phones, thousands of dollars in cash without a substantial source of income, and a car with out-of-state plates that was not registered in his name," all of which "could support a reasonable inference that he had obtained the car and the money through some unlawful means, or at least in some way that he would not admit to publicly." 188 Wn.2d at 615. The problem, according to the Court, was that "there [was] no evidence that he obtained it as payment for participating in drug transactions." *Id.* at 616. The only controlled substance-related evidence was that a user's amount of cocaine was discovered in Mr. Gonzalez's car. A user's amount of cocaine does not prove any of the criteria for forfeiture provided by RCW 69.50.505(1)(g) or support a reasonable inference that a person's currency or other assets meet that criteria.

Here, by contrast, there is substantial evidence that Mr. Crawford was involved in extensive drug trafficking during the relevant period of time. It is easily and reasonably inferred that drug trafficking was the most likely direct or indirect source of Mr. Crawford's currency as well as a resource he could use to facilitate his drug trafficking. Moreover, through its prehearing discovery, the Task Force was able to show that Mr. Crawford had been required to disclose any legitimate source of the funds and had been unable to do so. That is *proof*, not shifting the burden of proof.

16

No. 34755-9-III
*Crawford v. Spokane Reg'l Safe Streets Task Force*

The forfeiture order is affirmed.[6]

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Fearing, C.J.

_____
Lawrence-Berrey, J.

_____

[6] Mr. Crawford requested an award of attorney fees under RCW 69.50.505(6) if he substantially prevailed in the appeal, but he does not.

17