

**FILE**
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JUN 2 9 2017

~Fairhurst, CJ.~
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on June 29 2017

~Susan L. Carlson~
SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| CITY OF SUNNYSIDE, | ) | |
| | ) | |
| Respondent, | ) | No. 93907-1 |
| | ) | |
| v. | ) | |
| | ) | EN BANC |
| ANDREAS GONZALEZ, | ) | |
| | ) | |
| Petitioner. | ) | Filed: JUN 2 9 2017 |
| | ) | |

YU, J.— This case presents a highly fact-intensive question: Is there

substantial evidence that petitioner Andreas Gonzalez's car and money were

connected to drug manufacturing or distribution such that they are subject to

forfeiture? The Sunnyside Municipal Court, acting as a hearing examiner, said

yes. The Yakima County Superior Court, acting in its appellate capacity, said no

and reversed. The Court of Appeals, Division Three, held that the superior court

improperly reweighed the evidence, and therefore reversed and reinstated the

forfeiture order. We now reverse the Court of Appeals, vacate the forfeiture order,

and grant Gonzalez's request for attorney fees.

## FACTUAL AND PROCEDURAL BACKGROUND

While driving in Sunnyside, Washington, Gonzalez was stopped for speeding by Sergeant Scott Bailey. Gonzalez was driving a BMW with California license plates. Sergeant Bailey noted that Gonzalez had two cell phones with him. Although Gonzalez had a Washington driver's license, the car was registered in California in another person's name. When asked who owned the car, Gonzalez said it belonged to a friend and gave a name that did not match the registration. Gonzalez testified that he gave the false name because "I was probably nervous, scared I'm gonna end up being arrested." Tr. (Apr. 7, 2014) at 18.

Sergeant Bailey determined that Gonzalez's license was suspended and therefore placed him under arrest. While Sergeant Bailey was waiting for another officer to assist with impounding the car, one of Gonzalez's cell phones rang and, at Gonzalez's request, Sergeant Bailey answered it. The caller was Gonzalez's girlfriend, who asked if the car could be released to her, and Sergeant Bailey refused. Gonzalez asked that his girlfriend be allowed to take possession of the property left in the car, including about $6,000 in cash. At that point, Sergeant Bailey became suspicious that Gonzalez was involved in criminal activity.

Officer Skip Lemmon then arrived with his canine partner to assist in the impound process. Gonzalez gave consent to a search of the car, which turned up a "[s]treet level amount, user amount" of cocaine and $5,940. *Id.* at 4-5. The canine

2

alerted separately to both the cocaine and the money. Because the canine had not been trained to alert for cash, Officer Lemmon believed that the alert indicated there were controlled substances on the money. At trial on cross-examination, Officer Lemmon "assume[d]" that traces of drugs on cash could be transferred through contact with counting and automatic teller machines, and "guess[ed]" that the federal government no longer relies on evidence of trace amounts of drugs being found on cash for precisely that reason. *Id.* at 13.

Gonzalez never explained to Sergeant Bailey why he had so much money in the car. However, during the search, Gonzalez did tell Sergeant Bailey that the car actually belonged to Gonzalez himself and asked if that made a difference. At that point, the officers suspected that both the car and the money were connected to an illegal drug transaction. Sergeant Bailey testified that

> from past experience or knowing and dealing with the situation, . . .
> it's not uncommon that a person be selected or offered a job to drive a
> vehicle that has a contents or contraband from one place to the other
> place and they get x amount of money plus the vehicle they used to
> transport.

*Id.* at 7. Believing this to be Gonzalez's situation, the officers seized both the car and the money, and the city of Sunnyside (City) sought forfeiture. Gonzalez had no prior arrests or convictions for any drug-related activity, although he did ultimately plead guilty in superior court to one charge of possession of a controlled substance for the cocaine that was discovered in the car.

Gonzalez testified at the forfeiture hearing. He explained that several days earlier, he had gone to California to visit relatives with his friend Martin in Martin's car. The relatives offered to sell their BMW to Gonzalez, who wanted to buy it but did not have enough money with him. Martin agreed to lend Gonzalez the money for the car if Gonzalez would pay him back as soon as they returned to Washington. Gonzalez and Martin had returned to Washington only two days before Gonzalez was pulled over, and the $5,940 was intended to pay Martin back. Martin also testified, and his account was consistent with Gonzalez's.

Gonzalez further explained that he had received money from both an insurance settlement and unemployment compensation benefits after fracturing his back four years ago. It is undisputed that Gonzalez had received more money from unemployment compensation over the years than the $5,940 found in his car. The amount of his insurance settlement is unknown. Gonzalez also testified that he lived with his parents, who paid all of his expenses except that Gonzalez paid rent "([i]naudible) when I can (inaudible) once a month."[1] *Id.* at 14.

---

[1] As a follow-up question, Gonzalez's attorney asked, "So you don't have a mortgage payment, *you don't have a rent payment* (inaudible) correct?" Tr. (Apr. 7, 2014) at 15 (emphasis added). Gonzalez said, "Yes." *Id.* This seemingly inconsistent answer indicates that the (inaudible) words might have been important. Perhaps Gonzalez did mean that his settlement and unemployment compensation funds had become "depleted." *City of Sunnyside v. Gonzalez*, No. 33262-4-III, slip op. at 19 (Wash. Ct. App. Oct. 20, 2016) (unpublished), http://www.courts.wa.gov/opinions/pdf/332624_unp.pdf. However, perhaps Gonzalez meant that he *used* to pay rent when he was working but has not paid rent since fracturing his back.

Finally, Gonzalez explained that the vehicle registration had not been in his name because he had returned to Washington on Saturday, August 31, and could not transfer title to himself before he was pulled over on Sunday, September 1. Gonzalez did transfer title to himself a few days later. By the time of the hearing, he had also registered the car and obtained a valid driver's license and insurance.

In closing argument, Gonzalez's attorney argued that most American currency has trace amounts of illegal drugs on it, many people keep their money in cash because they do not trust banks, and the reason Gonzalez had two cell phones was because he was having an affair and did not want calls to or from his girlfriend to show up on his regular phone.

The hearing examiner ruled in favor of the City. The hearing examiner's initial letter decision noted that this was a "rather difficult" case in which "[t]here was not one thing in itself" that was dispositive. Clerk's Papers (CP) at 67. However, the final order found that the City had met its burden of proving that Gonzalez's car and money were "used and/or intended to be used for a controlled substance violation, specifically the furtherance of the sale of an illegal drug." *Id.* at 70. The order specifically highlighted several facts:

1. There were 2[ ]cell phones found under the control of the claimant, Mr. Gonzalez, at the time he was stopped by officers;
2. Cocaine was found in the vehicle;
3. There was a large amount of cash in the vehicle, to wit $5,940.00;

4.     Officers testified that the cash was "coated" by enough cocaine so that the drug dog also alerted to the cash;

5.     The vehicle, a 2001 BMW, was not in the name of the claimant at the time of the incident, however he had driven it from California just prior to being stopped;

6.     The fact that the Claimant, Mr. Gonzalez, states he received money from an injury and from unemployment does not seem to explain all of the cash that was present.

*Id.* Gonzalez appealed to the Yakima County Superior Court.

After hearing oral argument, the superior court reversed, concluding that "looking at the findings, even considering them as a whole, I don't think that a reasonable person could find that the money and the vehicle were involved somehow in narcotics trafficking based upon the record we have." Verbatim Report of Proceedings (VRP) (Feb. 17, 2015) at 23-24.

The City appealed to the Court of Appeals, Division Three, which reversed and reinstated the forfeiture order.[2] The Court of Appeals reasoned that "[b]ecause appellate courts—including superior courts sitting in an appellate capacity—do not reweigh evidence, the superior court erred when it reweighed the evidence." *City of Sunnyside v. Gonzalez*, No. 33262-4-III, slip op. at 2 (Wash. Ct. App. Oct. 20, 2016) (unpublished), http://www.courts.wa.gov/opinions/pdf/332624_unp.pdf. The Court of Appeals also specifically disapproved of a published Division Two

---

[2] The City also raised issues related to the superior court's jurisdiction and the applicable law governing its review. *City of Sunnyside*, slip op. at 10, 13. Those issues are not before us.

6

forfeiture case. *Id.* at 17 (discussing *Valerio v. Lacey Police Dep't*, 110 Wn. App. 163, 39 P.3d 332 (2002)).

We granted Gonzalez's petition for review. Order Granting Review, *City of Sunnyside v. Gonzalez*, No. 93907-1 (Wash. Mar. 8, 2017). Gonzalez's car is still in the City's possession, and the City has represented that it will not sell or dispose of the car until this case is completed.[3] VRP (Apr. 3, 2015) at 13.

## ISSUES

A.    Did the City produce substantial evidence to support the hearing examiner's decision that Gonzalez's car and money were subject to forfeiture pursuant to RCW 69.50.505?

B.    Is either party entitled to attorney fees on review?

## STANDARD OF REVIEW

Our review is governed by Title 34 RCW. RCW 69.50.505(5). We review the original forfeiture order entered by the hearing examiner, not the order of reversal entered by the superior court. *King County v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 142 Wn.2d 543, 553, 14 P.3d 133 (2000). Gonzalez bears the

---

[3] After oral argument, the City filed a statement of additional authorities pursuant to RAP 10.8, citing *United States v. $11,320.00*, 880 F. Supp. 2d 1310 (N.D. Ga. 2012), and *United States v. $22,991.00*, 227 F. Supp. 2d 1220 (S.D. Ala. 2002). The City had referenced both cases during oral argument, but had not previously cited them in its briefing. Gonzalez moved to strike the statement of additional authorities, and the City did not respond. The City's additional authorities make no difference to our analysis, and we deny the motion to strike.

burden of showing the forfeiture order was erroneous. RCW 34.05.570(1)(a).

Gonzalez challenges the forfeiture order on the basis that "[t]he order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under [chapter 34.05 RCW]." *Id.* at (3)(e). Evidence is "substantial" if there "is 'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order.'" *King County*, 142 Wn.2d at 553 (quoting *Callecod v. Wash. State Patrol*, 84 Wn. App. 663, 673, 929 P.2d 510 (1997)).

## ANALYSIS

The Uniform Controlled Substances Act, chapter 69.50 RCW, provides for forfeiture of property that is connected to an intended or completed controlled substances violation. RCW 69.50.505. Forfeiture is intended to deter and penalize drug-related crimes by targeting the profits generated by the commercial production and distribution of controlled substances. LAWS OF 1989, ch. 271, § 211; *State v. Cole*, 128 Wn.2d 262, 274, 276, 906 P.2d 925 (1995). To further its purpose, the statute generally does not contemplate forfeiture where the only

violation is mere possession of a controlled substance; the violation usually must involve drug manufacturing or transactions.[4] RCW 69.50.505(1)(b), (d), (g), (h).

Property connected to such a violation is "subject to seizure and forfeiture and no property right exists in [it]." *Id.* at (1). The "seizing law enforcement agency" (the City in this case) bears the burden "to establish, by a preponderance of the evidence, that the property is subject to forfeiture." *Id.* at (5); *see also City of Walla Walla v. $401,333.44*, 150 Wn. App. 360, 367-68, 208 P.3d 574 (2009).

There is not sufficient evidence to support forfeiture in this case. The evidence presented could arguably support a finding that Gonzalez obtained his car and money through some kind of unlawful means. However, there was no evidence to support a finding that Gonzalez obtained his property through the specific unlawful means of drug manufacturing or transactions as required by both the plain language and the underlying purpose of the forfeiture statute. We therefore reverse the Court of Appeals and vacate the forfeiture order.

1.     Identifying the relevant statutory provision

Throughout these proceedings, the City has variously cited multiple provisions of the forfeiture statute. CP at 59 (citing RCW 69.50.505); VRP (Feb. 17, 2015) at 17 (citing RCW "69.55.05(d) [sic]"); City of Sunnyside's Appellant

---

[4] There are some exceptions, notably for the controlled substances themselves, which are of course subject to forfeiture based on mere possession. RCW 69.50.505(1)(a).

9

Br. at 14 (citing RCW 69.50.505(1)(d), (g)). On review to this court, both parties

appear to rely on only RCW 69.50.505(1)(g). Pet. for Review at 10-11; Answer in

Opp'n to Pet. for Review at 1; Pet'r Gonzalez's Suppl. Br. at 1. However, RCW

69.50.505(1)(g) has three distinct clauses, which allow forfeiture of the following:

> [(1)] [a]ll moneys, negotiable instruments, securities, or other tangible or intangible property of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this chapter . . . ,
>
> [(2)] all tangible or intangible personal property, proceeds, or assets acquired in whole or in part with proceeds traceable to an exchange or series of exchanges in violation of this chapter . . . , and
>
> [(3)] all moneys, negotiable instruments, and securities used or intended to be used to facilitate any violation of this chapter.[5]

It is not entirely clear which of these clauses is at issue. The hearing examiner

determined that the car and money were "used and/or intended to be used for a

controlled substance violation, specifically the furtherance of the sale of an illegal

drug." CP at 70. This finding most closely resembles the language of clause (3) as

listed above. However, on review to this court and at oral argument, both

Gonzalez and the City frame the issue as whether there is substantial evidence that

the car and the money were "traceable" to drug transactions, apparently relying on

---

[5] We have altered the formatting and added ordinal numbers in an effort to make the relevant portions of this long statutory provision easier to read.

10

clause (2) as listed above. Pet. for Review at 1, 10; Answer in Opp'n to Pet. for Review at 6.

Furthermore, the briefing from both parties appears to assume that forfeiture is allowed pursuant to RCW 69.50.505(1)(g) for personal property if the property is "traced as the proceeds of illegal drug activity." Pet. for Review at 10; *see also* Answer in Opp'n to Pet. for Review at 6. While this assumption may be appropriate as applied to the federal forfeiture statute, 21 U.S.C. § 881(a)(6), it is inconsistent with the plain language of Washington's statute, which allows forfeiture of personal property that was *"acquired in whole or in part with* proceeds traceable to an exchange or series of exchanges in violation of this chapter," RCW 69.50.505(1)(g) (emphasis added). There is no evidence that Gonzalez acquired the car and money *with the proceeds of* a drug transaction; the State's theory is that Gonzalez acquired the car and money *as payment for* his participation in a drug transaction. *Cf. Tri-City Metro Drug Task Force v. Contreras*, 129 Wn. App. 648, 119 P.3d 862 (2005) (considering whether evidence showed that personal property *was acquired with* proceeds of a drug transaction). The statutory provision the parties point to simply does not line up with the facts presented in this case.

We disapprove of this lack of clarity, which could be very problematic in some cases, particularly in terms of providing proper notice to the claimant and

defining the issues on review. *See King County Dep't of Pub. Safety v. 13627 Occidental Ave. S.*, 89 Wn. App. 554, 950 P.2d 7 (1998) (decision based largely on differences in language between different provisions of the forfeiture statute). However, the parties do not raise such concerns in this case, and their arguments indicate that "traceable" is likely intended as shorthand for the general idea that personal property must be adequately connected to drug activity in order to be forfeited. We therefore evaluate whether forfeiture was appropriate pursuant to any relevant part of the statute. *See* RCW 69.50.505(1)(d), (g).

2.      There is not substantial evidence supporting forfeiture

We must first define the proper scope and standard of review because Division Three in this case expressly disapproved of a published Division Two forfeiture case. We reaffirm our long-standing precedent and hold that Division Three's disapproval of Division Two's analysis was misplaced. On the merits, we hold that there was not substantial evidence supporting forfeiture in this case.

a.      There is no actual conflict regarding the scope and standard of appellate review

Despite the fact that the standard of review in this type of case is settled law, Division Three in this case disapproved of a published Division Two case, which Division Three characterized as improperly requiring the seizing law enforcement agency to "disprove, *to the appellate court's satisfaction*, the claimant's

assertions." *City of Sunnyside*, slip op. at 17 (discussing *Valerio*, 110 Wn. App. 163). We must resolve this apparent split. The question is not whether Division Two reached the correct *result* in *Valerio*; that case was decided over 15 years ago, and no party sought further review. The question is whether *Valerio* used the correct *analytical approach*. We hold that it did.

As Division Three correctly noted, "[W]e do not reweigh evidence or redetermine credibility" on review. *Id.* at 19. The parties are not required to prove or "disprove" any factual issues at the appellate level. *Id.* at 17. However, our function is not to automatically affirm the hearing examiner's decision either. Appellate courts must be satisfied that the seizing law enforcement agency presented "'a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the [hearing examiner's] order,'" *King County*, 142 Wn.2d at 553 (quoting *Callecod*, 84 Wn. App. at 673), and the claimant must carry the burden of showing otherwise, RCW 34.05.570(1)(a).

While Division Three may not have agreed with the result in *Valerio*, *Valerio*'s analysis did not exceed the proper scope of appellate review. *Valerio* concerned the city of Lacey's attempt to obtain forfeiture of $58,300 in cash that was found in the trunk of Mark Valerio's girlfriend's car. *Valerio*, 110 Wn. App. at 165. The Court of Appeals questioned, but ultimately left intact, the lower

court's determination that Valerio's explanations for how he obtained the money were not credible. *Id.* at 179.

However, the Court of Appeals reversed the forfeiture order because the only evidence connecting the money to illegal drug transactions was (1) a statement by Valerio's girlfriend that Valerio was considering starting a drug business and (2) the fact that a drug-sniffing dog had alerted to the money. *Id.* at 179-80. The girlfriend "had no actual knowledge of [Valerio's] involvement with any drug business, past, present, or future," and Valerio had no known or suspected history of any illegal drug activity. *Id.* at 179. There was no evidence indicating the drug-sniffing dog could distinguish between trace amounts of drugs absorbed by direct contact with the drugs themselves or by absorption from other sources, and crime lab testing could not confirm the presence of any illegal drugs on the money. *Id.* at 180. Given this scant evidence, the court held that "there was but mere suspicion, not a reasonable, factual basis for belief that the money had been used, or would be used[,] in drug-dealing."[6] *Id.* at 182.

Thus, the *Valerio* analysis rested on the lack of evidence supporting forfeiture and not on improper credibility determinations, as Division Three

---

[6] The prior version of the forfeiture statute at issue in *Valerio* required the seizing law enforcement agency to establish probable cause to seize the property, after which the burden shifted to the claimant to prove by a preponderance of the evidence that the property was *not* subject to forfeiture. *Valerio*, 110 Wn. App. at 176. The statute has since been amended to place the burden of proof on the seizing law enforcement agency. LAWS OF 2001, ch. 168, § 1(e).

suggested in this case. *City of Sunnyside*, slip op. at 17. There is no actual conflict regarding the proper scope and standard of appellate review in forfeiture cases.

    b.  Substantial evidence does not support forfeiture

In the case before us, the hearing examiner's final order makes six preliminary findings in support of its ultimate finding that Gonzalez's property is subject to forfeiture. However, one of the preliminary findings is not supported by substantial evidence, and the remaining preliminary findings, taken together, do not provide substantial evidence supporting the ultimate finding that Gonzalez's property was subject to forfeiture in accordance with RCW 69.50.505.

The preliminary finding that "[o]fficers testified that the cash was 'coated' by enough cocaine so that the drug dog also alerted to the cash" is not supported by substantial evidence. CP at 70. Without question, there would be substantial evidence to support a finding that the canine alerted to the cash, and the weight to be afforded to that is to be decided by the hearing examiner, not an appellate court.[7] However, the preliminary finding that was actually entered goes beyond the evidence presented and rests on unreasonable inferences.

---

[7] We do note, however, that a number of federal courts have questioned the probative value of a drug dog alerting to cash without proof that the dog can distinguish between cash that has had substantial contact with drugs and cash that has only trace amounts of drugs on it as the result of ordinary circulation. *See, e.g.*, *United States v. $30,060.00*, 39 F.3d 1039, 1043 (9th Cir. 1994); *United States v. $49,790*, 763 F. Supp. 2d 1160 (N.D. Cal. 2010).

First, it is unreasonable to infer from the fact that the canine alerted to the money that the money specifically had cocaine on it. The drug dog was trained to alert for "[m]arijuana, cocaine, black tar, her [sic], heroin[ ], meth, and crack." Tr. (Apr. 7, 2014) at 11. There was no evidence that the canine would alert differently to different kinds of drugs, and there is no indication the cash was ever tested for the presence of any specific drug. This is significant because the only controlled substance found in Gonzalez's car was cocaine, not marijuana, heroin, or methamphetamine.

Second, even though the word is in quotes in the hearing examiner's decision, no one testified that Gonzalez's money was "'coated'" in anything. CP at 70. Officer Lemmon testified only that the canine alerted to the money and had not been trained to alert for cash, leading to an assumption that there was "some" amount of a controlled substance on the money.[8] Tr. (Apr. 7, 2014) at 12.

While this may seem like a small distinction, the hearing examiner's choice of the word "'coated'" is significant when taken in context of this preliminary finding as a whole. The finding is not simply that the canine alerted to the money or that one could reasonably infer that the canine alerted to the money because there was some controlled substance on it. Rather, the finding indicates that the

---

[8] We also note that while this finding refers to "[o]fficers" in the plural, only Officer Lemmon provided any testimony regarding the canine. CP at 70.

16

hearing examiner believed that the amount of controlled substances on Gonzalez's money was significantly greater than one would find on money that had not been used in a drug transaction. CP at 70 ("the cash was '*coated*' by *enough* cocaine so that the drug dog also alerted to the cash" (emphasis added)). There was no evidence presented to support such a finding.

We therefore evaluate whether there was substantial evidence supporting forfeiture in light of the following remaining findings:

1. There were 2[ ]cell phones found under the control of the claimant, Mr. Gonzalez, at the time he was stopped by officers;
2. Cocaine was found in the vehicle;
3. There was a large amount of cash in the vehicle, to wit $5,940.00;

. . . .

5. The vehicle, a 2001 BMW, was not in the name of the claimant at the time of the incident, however he had driven it from California just prior to being stopped;
6. The fact that the Claimant, Mr. Gonzalez, states he received money from an injury and from unemployment does not seem to explain all of the cash that was present.

*Id.* It is clear that the hearing examiner determined that Gonzalez's testimony was not credible, and we defer to that determination. This credibility determination, along with the fact that Gonzalez had multiple cell phones, thousands of dollars in cash without a substantial source of income, and a car with out-of-state plates that was not registered in his name, could support a reasonable inference that he had

17

obtained the car and the money through some unlawful means, or at least in some way that he would not admit to publicly.

However, the City's burden was not merely to show that Gonzalez's property was connected to *some* illegal or untoward activity. It was required to prove, by a preponderance of the evidence, that Gonzalez's car and money were specifically connected to drug manufacturing, transactions, or distribution. The only preliminary finding that is supported by substantial evidence and relates in any way to controlled substances is the undisputed finding that cocaine was found in the car. The cocaine was described as a "[s]treet level amount, user amount," Tr. (Apr. 7, 2014) at 5, "definitely less than an eighth of an ounce," *id.* at 6, of "crack cocaine," *id.* at 12, that was in a "cigarette pack" in the car's center console, *id.* at 13. There was no other paraphernalia to indicate that Gonzalez had separated this cocaine from a distribution-level amount. Gonzalez was clearly guilty of possession, but there was no evidence that his drug-related activities ever had or ever would include drug manufacturing, transactions, or distribution.

Allowing forfeiture under these circumstances would mean that a person's property may be subject to forfeiture if it is connected to possession of even a small amount of a controlled substance. The statute's plain language, however, targets the profits of drug manufacturers and distributors, not the property of end-level users who are guilty of nothing more than mere possession. Even if the

18

hearing examiner did not believe that Gonzalez obtained his property legally, there is no evidence that he obtained it as payment for participating in drug transactions. We therefore reverse the Court of Appeals and vacate the forfeiture order.

B.    Gonzalez is entitled to attorney fees on review

Both parties requested attorney fees at the Court of Appeals, which are "considered as continuing requests at the Supreme Court." RAP 18.1(b). Gonzalez substantially prevails on review and is thus clearly entitled to reasonable attorney fees, so we grant his request. RCW 69.50.505(6); RAP 18.1(a). The City, meanwhile, points to no applicable law that would allow it to recover attorney fees, so we deny its request.

## CONCLUSION

Even where the question is limited to whether substantial evidence supports a finding by a mere preponderance of the evidence, appellate review must be sufficiently robust to ensure that an order of forfeiture is in fact supported by substantial evidence so as not to deprive people of significant property rights except as authorized by law. This is particularly important in the forfeiture context because an individual may lose valuable property even where no drug crime has actually been committed, and because the government has a strong financial incentive to seek forfeiture because the seizing law enforcement agency is entitled to keep or sell most forfeited property. RCW 69.50.505(7).

19

The Court of Appeals erred in holding that the forfeiture order in this case was supported by substantial evidence. We therefore reverse the Court of Appeals, vacate the forfeiture order, and grant Gonzalez's request for reasonable attorney fees.

_____
Yu, J.

WE CONCUR:

_____
Fairhurst, C.J.

_____
Johnson, J.

_____
Madsen, J.

_____
Owens, J.

_____
Stephens, J.

_____
Wiggins, J.

_____
González, J.

_____
Gordon McCloud, J.

21